# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 13, 2009

## STATE OF TENNESSEE v. ROGER GLENN DILE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-C-2490     Cheryl A. Blackburn, Judge**

---

**No. M2008-00389-CCA-R3-CD - Filed September 24, 2009**

---

A Davidson County jury convicted the Defendant, Roger Glenn Dile, of rape of a child, a Class A felony; attempted rape of a child, a Class B felony; and two counts of aggravated sexual battery, a Class B felony.  The trial court imposed a total effective sentence of thirty-two years to be served at 100% as a child rapist.  The Defendant appeals, contending: (1) the evidence, as a matter of law, was insufficient to support his convictions because the proof at trial fatally varied from his indictments; (2) the trial court erred when it failed to merge one of his aggravated sexual battery convictions into his rape of a child conviction; and (3) the trial court erred when it set the length and alignment of his sentences.  After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

J. Michael Engle (at trial), Nashville, Tennessee, and Jeffrey A. DeVasher (on appeal), Nashville, Tennessee, for the Appellant, Roger Glenn Dile.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Leslie E. Price, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; J.W. Hupp Assistant District Attorney General, for the Appellee, the State of Tennessee.

### OPINION

### I.  Facts

#### A. Indictment

In September 2006, a Davidson County grand jury issued an indictment charging that the Defendant "on a date between April, 2005 and May, 2005," committed two counts of rape of a child,

one count of attempted rape of a child, one count of aggravated sexual battery, and two counts of providing pornography to a minor. After the trial court determined that the counts charging the Defendant with providing pornography to a minor were filed outside of the applicable limitations period, those counts were removed from the indictment. The four remaining counts of the indictment remained unchanged.

During a pre-trial hearing, the State informed the trial court and defense counsel that the date of the charged offenses may have been earlier than the date set out in the indictment. The State said the indictment was based on information gathered by the Department of Children's Services, which had interviewed the victim's mother but not the victim. According to the State, the victim's mother, Sandy Delk, was not a reliable witness and, as a result, would not be relied upon at trial to establish the date of the conduct. Further, all adult witnesses likely to know relevant dates were uncooperative. The victim, who was seven at the time of the offenses, recalled only that the offenses occurred in two different houses, located on Oneida Street and Marshall Street. The victim did not know the dates on which she moved into either house. She could recall only that she lived briefly in the Oneida Street house and for six weeks to two months in the Marshall Street house.

The State explained that, due to the victim's uncertainty and the lack of a reliable adult witness, the proof showed only that the various instances of conduct occurred between December 2004 and April 2005. As a result, the State would be unable to prove that the offenses occurred specifically between April and May of 2005, as the indictment alleged. In order to give defense counsel adequate time to prepare for the State's proof that the alleged conduct occurred between December 2004 and May 2005, the trial court continued the Defendant's trial for six months. Ultimately, the trial took place in September 2007, nine months after the pre-trial hearing. The State did not amend the indictments against the Defendant to reflect an earlier offense date.

**B. Jury Trial**

At trial, the State presented the following proof: K.D.,[1] who was nine years old at the time of trial, testified she lived with her paternal grandmother, her six-year-old sister, and her three-year-old brother at the time of trial. K.D. said she no longer saw her mother, Sandy Delk, with any frequency.

Upon being shown a picture of a house on Oneida Street, K.D. said she lived in the house with her maternal grandmother, whose married name is Debbie Delk Dile (hereinafter referred to as "Dile"); the Defendant, who was her grandmother's boyfriend and is now her husband; and her baby cousin "Bryant." Upon being shown a picture of a house on Marshall Street, she identified it as the house where she was staying when police interviewed her on May 15, 2005, about the conduct at issue. She said that, at the time, her younger brother, mother, and younger sister lived at the Marshall Street house. She said her grandmother and the Defendant lived at the Marshall Street house "half the time." She testified she began staying at the Marshall Street house only shortly

---

[1] Given the nature of the crimes, we will refer to the victim by her initials to protect her privacy.

before the May 15 interview. She said that, after the May 15 interview, she never lived with her grandmother and the Defendant again.

Recalling the period in which she lived in the Oneida Street house with Dile and the Defendant, she said the Defendant took care of her when her grandmother, Dile, went to work. The first incident of "secret" activity between herself and the Defendant occurred when Dile was working and the Defendant was watching K.D. K.D., fully clothed, went into Dile's room to retrieve a pair of pants. While there, the Defendant entered and told her to get on the bed. The defendant then removed K.D.'s pants and underwear, and began to "lick" K.D.'s "private," while he moved his hand in and out of her vagina and around her anus. The Defendant instructed K.D. to tell no one of the sexual contact. K.D. said other "secret" conduct followed this first contact.

K.D. testified that, while she was bathing in a bath tub at the Oneida house, the Defendant, already undressed, entered the bathroom, lowered himself into the bath tub, and began to wash K.D.'s vagina using his hand and a rag. She testified that, while they were in the bath tub, the Defendant placed his hand both inside and outside her vagina, and he rubbed her breasts. She testified that she was old enough to bathe herself and that she had not asked the Defendant to help her bathe.

K.D. next testified that, during the Spring, while she still lived in the Oneida house, she and the Defendant dropped off Dile at a tanning salon. The Defendant and K.D. waited in the cab of the Defendant's El Camino truck while Dile tanned. After several minutes, the Defendant unzipped his pants and placed his penis in K.D.'s view. The Defendant then pushed K.D.'s head toward his penis, instructing her to "suck it." K.D. refused, but the Defendant continued to urge her to proceed. After a few minutes of his requests, K.D. told the Defendant she would scream if he continued to push her head toward his penis. At that point, Dile emerged from the tanning salon, and the Defendant reassembled himself before she reached the truck. The Defendant instructed K.D. again to not tell anyone what he asked her to do.

K.D. recalled that, at some point, she began staying at the Marshall house, and on the third day she stayed at the Marshall house, her family began loading a U-Haul truck in order to move some family members into a newly rented home. On this day, K.D. told a relative she identified as "Aunt Kim" about the Defendant's behavior. After this, Detective Keith Sutherland came to the Marshall house and interviewed K.D. K.D. did not tell Dile directly about the Defendant's conduct until after she was removed from the Marshall home. According to K.D., however, Dile "did not want to believe" her and admonished her to "stop telling stories."

On cross-examination, K.D. explained she moved in with Dile and the Defendant because a judge determined Dile and K.D.'s mother should share custody of K.D. She said the Defendant's conduct occurred during Spring, at various times of the day and night. She explained she ordinarily would have been attending school during this time, but Dile failed to enroll K.D. in school when she began living with Dile. K.D. said her brother's first birthday, which fell on April 15, 2005, occurred in the middle of the period during which the Defendant abused her.

3

K.D. estimated she, the Defendant, and Dile moved from the Oneida house to the house on Marshall Street approximately three weeks after the Defendant began making sexual contact with her. On the third day she lived at the house on Marshall Street, she told her aunt about the Defendant's behavior. K.D. confirmed that the Department of Child Services ("DCS") removed her from the Marshall house on the same day she told her aunt about the Defendant's conduct. As a result, she never moved back in with the Defendant and Dile. She said she did not see Dile again until Dile's wedding to the Defendant and, on that occasion, she spoke directly with Dile about the Defendant's conduct for the first time. K.D. said no one else was present during her discussion with Dile. She testified she did not know anyone named "Crystal Gayle Lindsley" and did not remember anyone by that name being present at Dile and the Defendant's wedding.

K.D. confirmed she had a videotaped conversation with Dawn Harper, a forensic interviewer with the Child Advocacy Center. Defense counsel asked K.D. whether she remembered making several statements from the conversation with Dawn Harper. K.D. recalled telling Harper about the Defendant asking her to suck his penis in his truck outside the tanning salon. She also recalled telling Harper that a second incident between herself and the Defendant occurred, though she was not sure exactly what she told Harper had occurred. She said that, while she and her sister were still living at the Oneida house, she and the Defendant lay in bed watching "The Proudest Family" on the Disney Channel. She testified that, while they lay together, the Defendant "touched" her in a way she could not specifically recall. Her sister, who had been in the kitchen, walked into the room and asked K.D. what the Defendant was doing, to which K.D. replied that she did not know.

K.D. did not remember telling Harper that the Defendant had told her to "suck" his penis while they lay watching the Disney Channel. She also did not recall saying her sister told their mother she had seen the Defendant touch K.D. Similarly, she did not recall telling Harper her sister then told her mother, who told her father, who then assaulted the Defendant. She testified she did not tell her mother about the Defendant's conduct before police interviewed K.D. on May 15, 2005.

On re-direct examination, K.D. testified that neither her mother nor her father was present in the Oneida house the day the Defendant touched her while they lay watching the Disney Channel. She recalled describing the Defendant's penis as "pink" when she was telling Harper about the Defendant asking her to perform oral sex in his truck outside the tanning salon. K.D. testified her father never "came around." She denied both wishing she had told her mother about the abuse and wishing her father had beaten up the Defendant.

Detective Keith Sutherland testified that, at the time of the conduct at issue, he was assigned to the Sex Crime Section of the Metropolitan Nashville Police Department. On May 15, 2005, Detective Sutherland was dispatched to the Marshall Street house to investigate a report of a sexual assault. When he arrived, he found the Defendant, an unidentified adult male, and an unidentified male child loading furniture onto a U-Haul truck. He approached the house and introduced himself to several members of K.D.'s family, including K.D.'s mother, Sandy Delk. K.D. then led the detective up a flight of stairs to the second floor of the home. As they ascended, the detective asked K.D. whether she wanted to share something with him, to which she replied, "He's been touching

4

me all over my body." She identified the man who touched her as "Pepa," her maternal grandmother's boyfriend, whom her grandmother later married.

Detective Sutherland described K.D. as a "quiet, shy child" who had "no issue" speaking with him about the Defendant's behavior. Because he had not received training to interview child sex abuse victims, he contacted DCS who dispatched a representative to interview K.D. Also, because Sex Crime policy was to forego a forensic physical examination if seventy-two hours had passed since the sexual assault occurred, he did not seek a medical exam of K.D.

While at the Marshall Street house, reference was made to an "Aunt Kim," but no one could supply the detective with an address or contact information for "Aunt Kim." In the days following his May 15, 2005, visit to the Marshall Street home, the detective continued his investigation of K.D.'s abuse allegations. He visited the Oneida home and the tanning salon, and he tried, without success, to locate and interview K.D.'s mother.

The detective said he watched through a video monitor while Harper interviewed K.D. He testified that, during the interview, K.D. recalled an incident during which the Defendant sexually penetrated her while she lay on the upper bunk of a bunk bed in her room. According to the detective, K.D. said her sister, having witnessed the Defendant penetrate her, alerted their parents, and K.D's father then assaulted the Defendant. The detective agreed this confrontation could not have occured because K.D.'s father was incarcerated during the time period of alleged abuse.

Sue Williams Burfield testified she was the supervisor of DCS field investigator Jessica Jones Montgomery, who responded to Detective Sutherland's report of child sex abuse on May 15, 2005. Burfield explained that Montgomery no longer worked with DCS. After meeting with K.D. at the Marshall Street residence, Montgomery drew up a "safety plan," which Burfield approved. Under the safety plan, K.D. was to live with her mother.

Because the safety plan was to expire in June 2005, Burfield and fellow DCS investigators attempted to contact K.D.'s mother in order to re-issue the safety plan. Unable to contact K.D.'s mother, on July 5, 2005, a DCS investigator called the home of a relative and was advised that Delk, at some point, had dropped K.D. and her siblings off at the relative's home. The relatives also did not know how to reach K.D.'s mother, so Burfield removed the children from the relative's home on July 5, 2005. Burfield then contacted Dile to discuss the children's custodial arrangement, and Dile requested custody of K.D. When Burfield explained she could not have custody of K.D. because she lived with the Defendant, who was accused of abusing K.D., Dile insisted the Defendant had done nothing to K.D. Dile declined to ask the Defendant to leave in order for K.D. to be allowed to live in her home. Ultimately, unable to locate Delk, the State took custody of the children and placed them in the home of another relative.

Burfield confirmed that a page of a handwritten notes, introduced into evidence for identification only, were notes she took while in the field investigating K.D.'s abuse allegations. The notes state that Delk had threatened she would "beat K.D. up" if she did not say "certain things" to police. Burfield said the notes were based on a statement from K.D.

5

Burfield next confirmed she was the author of a series of electronic notes about K.D.'s case contained in a print-out presented in court. She confirmed the notes reflected that K.D. told Montgomery that the Defendant had urged her to perform fellatio on him, though K.D. did not appear to say when or where he had done so.

On re-direct examination, Burfield confirmed DCS had investigated several complaints involving Delk family members before it received information about the Defendant's behavior. One of these complaints was based on K.D's sustaining a head injury after her mother allegedly hit her in the head with a glass beer mug. The DCS investigation into the physical abuse allegation against Delk was ongoing while DCS investigated the subsequent allegation of sexual abuse against the Defendant.

At the close of the State's proof, the trial court granted the Defendant's motion for judgment of acquittal as to the charge of rape of a child in COUNT 2, and it submitted the lesser-included offense of attempted rape of a child, as well as appropriate lesser-included offenses of attempted rape of a child, for the jury's consideration in COUNT 2.

The Defendant presented the following proof: Crystal Gayle Lindsley, the Defendant's twenty-eight year old daughter, testified she saw K.D. three to four times a week during May and April 2005. According to Lindsley, the Defendant sold his El Camino truck before investigators arrived at the Marshall residence on May 15, 2005. Lindsley did not recall, however, how long before May 15 the Defendant sold the truck.

Lindsley testified she witnessed K.D.'s mother tell K.D. she would "beat the [expletive] out of" K.D. if she did not tell investigators the Defendant sexually assaulted her. She said K.D. called her "Aunt Kim." Lindsley also testified that, at Dile and the Defendant's wedding, K.D. said to her, "Papa didn't do this to me . . . I had to tell the social work and police and everybody that he did so I wouldn't get . . . beat up."

On cross-examination, Lindsley testified she loved her father, did not want anything bad to happen to him, and did not believe he sexually assaulted K.D. She insisted K.D. knew her as "Aunt Kim," and called her by that name.

Debra Delk Dile, K.D.'s grandmother, testified she was engaged to the Defendant during May 2005, and she married him around July 27, 2005, six weeks after officers began investigating him for sexually abusing K.D. She recalled that, in early 2005, K.D. visited her and begged her not to make her return to her mother's home. K.D. explained to Dile that her mother had hit her and thrown her by her hair. Dile then filed a petition in Davidson County Juvenile Court alleging her daughter had physically abused K.D. Dile said that, although her relationship with her daughter had always been strained, it worsened after she filed the petition against her daughter. After a hearing on the petition, the juvenile court ordered K.D. to stay with Dile during the week and her mother on the weekends. She recounted that K.D. was to return to Dile's custody the day investigators arrived at the Marshall residence.

Dile testified the Defendant traded his El Camino truck for a van two months after they began dating, which was "way before" April and May 2005. She recalled that she, K.D., K.D's sister, the Defendant, the Defendant's adult daughter, and Delk used to go to the tanning salon "as a family thing." She insisted, however, that the Defendant and K.D. were never left alone while she tanned.

Dile testified she lived for two and a half years at the Oneida home before she began dating the Defendant. She said that she lived at the Marshall house "for a while." Dile said that neither the Oneida house nor the Marshall house had bunk beds.

Dile tesified that, the night before her wedding, she asked K.D. whether what she told police about the Defendant was true. According to Dile, K.D. responded, "[M]ama, they wouldn't listen. No, they won't listen to me. I tried to tell them but they won't listen to me." Dile stated that K.D. was a bridesmaid in their wedding and presented a picture of K.D. standing near the Defendant during the wedding. Dile tesified that K.D. never acted as though she feared the Defendant or did not want to be around him.

On cross-examination, Dile testified she loved the Defendant, who was her husband. She clarified they were married July 30, 2005. Dile explained that she reported her daughter for abusing only K.D. and not her other children because her daughter "took her frustration" out on K.D. alone. She clarified that she filed the petition in April 2005 and thereafter shared custody of K.D. with her daughter.

Dile said she and the Defendant briefly lived in the Marshall Street residence, where Delk also lived. She explained they stayed at the Marshall Street house while they prepared to move into a new house.

Dile said that, while K.D. lived with her and the Defendant at the Oneida Street residence, Dile worked, but the Defendant did not. She testified the Defendant, however, was never alone with K.D. She said she "always had a houseful of people" that would have been present when she was not. She testified she trusted the Defendant to be alone with K.D.

Dile testified she believed her daughter forced K.D. to falsely accuse the Defendant of abusing her, reiterating that K.D. did not appear to be scared of the Defendant the night before or the day of their wedding.

On re-direct examination, Dile testified her daughter often retaliated against her when she refused to give her daughter money for rent or bills. She theorized that, because she and the Defendant were about to move out of the Marshall Street house, her daughter feared that her access to her mother's money would disappear. When investigators arrived at the Marshall Street house on May 15 to speak with K.D., Dile was at work, and the Defendant was at the house on Marshall Street loading a U-Haul truck with their belongings to prepare for the move into their new house. Dile said Detective Sutherland came and interviewed her at work on May 15. Dile theorized that her daughter induced K.D. to accuse the Defendant of abusing her because her daughter realized she would get less money from her mother if her mother moved into a new home with the Defendant.

7

Patricia Martin, the paternal grandmother of K.D.'s cousin Bryant, testified that, in April and May 2005, she came into frequent contact with members of K.D.'s family because she visited her grandson three or four times a week. She testified the Defendant owned an El Camino truck when he and Dile began dating but traded it for a van two or three months later. She believed he made the trade before the May 15 investigation. She said she had been to many of the various homes K.D.'s family occupied, saying the family never entered into formal leases and, as a result, moved frequently. She said she had never seen a bunk bed in any of the Delks' homes she visited. Martin testified she heard Delk tell K.D. "she would beat her brains in" if K.D. did not tell police what Delk instructed her to say. Martin did not identify what Delk instructed K.D. to say.

On cross-examination, Martin explained she overheard Delk's threat to K.D. when she was picking up her grandson Bryant from the Oneida Street house where Dile and the Defendant lived and Delk sometimes stayed. She testified that, because Delk was frequently verbally abusive to K.D., Delk's aggressive behavior was not out of the ordinary.

In rebuttal, the State called Dawn Harper and again called Detective Sutherland to testify. Dawn Harper testified she was a forensic interviewer at the Nashville Child Advocacy Center during the investigation of the charges against the Defendant. Harper explained the procedure for conducting a forensic interview, which she testified she followed when she interviewed K.D.: she sits on the floor of an empty room with the child, attempts to build a rapport with the child, and asks the child to tell her about the event at issue.

Harper interviewed K.D. on May 27, 2005, and she prepared a short report of the interview, which the State presented at trial. She confirmed that her interview of K.D. was videotaped and that she reviewed the videotape the morning of her testimony.

She recalled that K.D. told her that, on one occasion, the Defendant woke her up by shaking her and "rubbing her privates" but that her younger sister caught the Defendant doing this. Harper confirmed that K.D. then said her father assaulted the Defendant because her sister told him what the Defendant had done to K.D.

Harper also recalled that K.D. said the Defendant told her to "suck it" while she lay on a bunk bed in her room watching the Disney Channel. Harper said K.D. never told her anything about the Defendant's conduct in an El Camino truck parked in front of a tanning salon.

On cross-examination, Harper said K.D. never told her the date on which the Defendant sexually contacted her. She said differentiating between the episodes of sexual contact was difficult. She attributed this difficulty to the practice in forensic interviewing of inviting "free narrative to where the child tells everything that they can."

Detective Sutherland testified that Dile, since the initiation of the investigation against the Defendant, insisted that K.D.'s mother forced K.D. to falsely accuse the Defendant of sexual abuse. In order to determine whether Dile was correct, the detective monitored a conversation between

K.D., Delk, and Dile. In the conversation, which no party knew he was monitoring, Dile insisted K.D. admit the Defendant did not abuse her, but both K.D. and her mother maintained that the allegations were true. Also, the detective arranged for a taxi equipped with a recording device to transport K.D. and her mother to the interview with Harper in order to detect whether Delk attempted to influence K.D.'s statement. He instructed the driver, an undercover police officer, to leave the two alone in the taxi for a brief period. K.D. and her mother barely spoke during the ride to and from the interview and said nothing during the period in which the driver left them alone in the taxi.

At the close of proof, the Davidson County jury convicted the Defendant of one count of rape of a child, one count of attempted rape of a child, and two counts of aggravated sexual battery.

### C. Sentencing Hearing

At the Defendant's sentencing hearing, the following evidence was presented: The State entered a presentence report, which stated that, at the time of sentencing, the Defendant was fifty years old, unemployed, and suffering from memory problems, "nerves," chronic obstructive pulmonary disease, limited vision and hearing, and hypertension. The Defendant dropped out of school in the seventh grade and worked in construction and maintenance. He married and divorced several times before he married Dile. He has two sons and two daughters from his previous marriages.

According to the presentence report, the Defendant has two convictions for aggravated assault, two convictions for assault, two convictions for driving under the influence, twelve convictions for driving with a revoked or suspended license, and one conviction each for possession of a prohibited weapon; manufacture, sale, or possession of an illegal substance; patronizing prostitution; selling drugs, reckless endangerment involving a deadly weapon, and grand larceny.

The presentence report included a victim impact statement from one of K.D.'s aunts. According to her statement, the abuse caused K.D. to fear strangers and being alone. The letter stated that K.D. had "daily problems with self-esteem and self-confidence" and that she continued to receive rape and sexual abuse counseling.

The Defendant introduced a report of his medical conditions, which confirmed that he suffered from chronic pulmonary obstructive disorder and asthma. Finally, as the Defendant committed his crimes before July 1, 2005, he signed a waiver for the trial court to sentence him under the 2005 Sentencing Reform Act. As such, the trial court concluded it could use factors other than his criminal history to enhance his sentence.

The trial court applied enhancement factors (1), that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, and enhancement factor (14), that the defendant abused a position of public or private trust, in a manner that significantly facilitated the commission or the fulfillment of the offense to enhance the Defendant's sentences. *See* T.C.A. § 40-35-114(1), (14). The trial court recognized the Defendant's "deteriorating health" as the only mitigating factor. The trial court sentenced the

Defendant as a child rapist to serve the following sentences at 100%: twenty-two years for the rape of a child conviction; ten years for the attempted rape of a child conviction; and ten years for each of the two aggravated sexual battery convictions. Finding factor (5) of the consecutive sentencing statute, which applies to defendants convicted of two or more statutory child sex abuse charges accompanied by aggravating circumstances, applied to the Defendant, the trial court ordered the Defendant to serve the twenty-two year sentence for rape of a child consecutively to the remaining sentences, for an effective sentence of thirty-two years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence, as a matter of law, was insufficient to support his convictions because the proof at trial fatally varied from his indictments; (2) the trial court erred when it failed to merge one of his aggravated sexual battery convictions into his rape of a child conviction; and (3) the trial court erred when it set the length and alignment of his sentences.

## A. Variance Between Indictment and Proof at Trial

The Defendant contends that the indictments issued against him allege he raped and assaulted the victim in April and May 2005 but that the State's proof established that the conduct occurred before April and May 2005. As a result, the Defendant argues, the proof at trial materially differed from the indictment and, therefore, prevented him from preparing an adequate defense. As such, he concludes, the proof at trial was insufficient as a matter of law to support his convictions.

The State responds first that, because the proof at trial established that the conduct occurred during the time period set out in the indictments, between April and May 2005, the proof at trial did not vary from the indictments. The State also argues that any variance between the dates in the indictments and at trial is not material because date is not a material element of any the offenses at issue. Further, the State argues, the Defendant failed to show how any variance between his indictments and the trial proof prevented him from preparing an adequate defense.

Both the Federal and Tennessee Constitutions guarantee the criminally accused knowledge of the "nature and cause of the accusation." U.S. Const. Amend. VI; *see also* Tenn. Const. art. I, § 9. In order to comply with these constitutional guidelines, an indictment or presentment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. T.C.A. § 40-13-202 (2003); *State v. Byrd*, 820 S.W.2d 739, 740-41 (Tenn. 1991). The Tennessee Supreme Court has stated:

> [A]n indictment is sufficient to satisfy the constitutional guarantees of notice to the accused if the indictment contains allegations that: (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense.

*State v. Hammonds*, 30 S.W.3d 294, 299 (Tenn. 2000) (citations omitted).

This Court explained, "A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). A variance is material only where the indictment or the bill of particulars and the proof do not substantially correspond. *Id.* (citing *State v. Mays*, 854 S.W.2d 638, 640 (Tenn. 1993)). A variance is prejudicial when it causes the defendant to be misled or surprised at trial, or leaves the defendant vulnerable to a second prosecution for the same offense. *Moss*, 662 S.W.2d at 592. It is not reversible error when a defendant is sufficiently aware of the charge and is able to adequately prepare for trial. *Id.*

Having reviewed the evidence presented at trial in this case, we conclude the evidence offered at trial did not fatally vary from the allegations set forth in the indictments. The indictments allege each offense occurred "on a date between April, 2005 and May, 2005 . . ." At trial, the victim testified the sexual contact occurred when she lived with Dile and the Defendant. Dile testified the victim began living with her on weekdays in April 2005. K.D. specified the Defendant began to sexually abuse her approximately three weeks before police interviewed her. The record reflects that police interviewed the victim on May 15, 2005, which indicates that the Defendant began sexually assaulting K.D. on or around April 24, 2005. K.D. also testified her brother's birthday, April 15, 2005, occurred in the middle of the time period during which the Defendant abused her. Therefore, K.D's and Dile's testimony show the sexual contact occurred in April and May 2005, which is consistent with the time frame laid out in the indictments. The proof at trial does not, therefore, vary from the indictments. As such, the proof offered by the State is not, as a matter of law, insufficient to support the Defendant's convictions. He is not entitled to relief on this issue.

### B. Merger

The Defendant contends that his convictions for rape of a child and aggravated sexual battery derive from the same conduct and, therefore, violate the double jeopardy clauses of the United States and Tennessee Constitutions. The Defendant acknowledges he failed to object to the trial court's entry of separate convictions and, consequently, waived review of this issue pursuant to Tennessee Rule of Appellate Procedure 3(e). He requests this court review the issue for plain error.

The State responds that the Defendant waived review of this issue but that, in the event this Court reviews the issue for plain error, this Court should affirm the Defendant's separate convictions for rape of a child and aggravated sexual battery because each conviction rests upon a separate, discrete act by the Defendant.

An appellate court may review an issue which would ordinarily be considered waived if the court finds plain error in the record. Rule 52 of the Tennessee Rules of Criminal Procedure states, "An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). Whether an

11

issue rises to the level of plain error is a decision that lies within the sound discretion of the appellate court and may be considered: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process, prevent manifest injustice, or to do substantial justice. *See* Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b); *State v. Adkisson*, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994).

The Defendant's convictions for rape of child and aggravated sexual battery rest on two actions the Defendant took during a single episode of sexual abuse against K.D. If indeed the Defendant's convictions are based on the same conduct for purposes of the double jeopardy clause, the convictions violate his rights against double jeopardy found in the United States and Tennessee Constitutions. In order to do substantial justice, therefore, we will review for plain error the trial court's failure to merge the Defendant's convictions for rape of a child and aggravated sexual battery. *See* Tenn. R. Crim. P. 52(b); *Adkisson*, 899 S.W.2d at 638-39.

In *Adkisson*, this Court stated that the following factors should be presented in order for an appellate court to determine whether an error constitutes "plain error": (a) the record must clearly establish what occurred at the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused must not have waived the issue for tactical reasons; and (e) consideration of the issue must be "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 641-42 (citations omitted). Our Supreme Court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

Merger of convictions is sometimes necessary in order to remedy the double jeopardy problem of multiple punishment. *State v. Beard*, 818 S.W.2d 376, 379 (Tenn. Crim. App. 1991). Because it is a question of law, this Court's review of a double jeopardy issue is de novo with no presumption of correctness. *State v. Lewis*, 958 S.W.2d 736, 738 (Tenn. 1997). The double jeopardy clause in the Unites States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend V. Similarly, the Tennessee Constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense. *State v. Burris*, 40 S.W.3d 520, 524 (Tenn. Crim. App. 2000).

This case falls into the third category, multiple punishments for the same offense, which has been referred to as the problem of "multiplicity." *See State v. Phillips*, 924 S.W.2d 662, 665 (Tenn. 1996). When multiple sentences are imposed in a single trial, double jeopardy protection "is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Prosecutors cannot avoid the limitations of the double jeopardy clause by the simple expedient of dividing a single crime into a series of temporal or spatial units. *State v. Easterly*, 77 S.W.3d 226, 232 (Tenn. Crim. App. 2000). Multiplicity of charges or convictions exists where prosecutors divide conduct into discrete

offenses, "creating several offenses out of a single offense." *State v. Charles L. Williams*, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920, at *29 (Tenn. Crim. App., at Nashville, Nov. 29, 2006) (quoting *Phillips*, 924 S.W.2d at 665). Whether the acts of a defendant constitute separate offenses or one single crime must be determined by the facts and circumstances of each case. *State v. Pickett*, 211 S.W.3d 696, 706 (Tenn. 2007).

A four-step analysis guides our determination of whether a defendant's acts constitute a single offense: (1) whether one offense is a lesser-included offense of the other under the *Blockburger*[2] analysis; (2) a consideration of the evidence used to establish the offenses, guided by the principles our Supreme Court articulated in *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); (3) a consideration of whether there were discrete acts or multiple victims; and (4) a comparison of the statutes and their respective purposes. *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996). However, "[n]one of these steps is determinative; rather the results of each must be weighed and considered in relation to each other." *Id.*; *see also State v. Mixon*, 983 S.W.2d 661, 675-76 (Tenn. 1999).

### 1. *Blockburger* Analysis

To conduct a *Blockburger* analysis, this Court must determine whether the statutory definitions of the offenses at issue require "proof of a fact that the other does not," with the focus being on the elements of the offenses. *State v. Black*, 524 S.W.2d 913, 920 (Tenn. 1984) (quoting *Blockburger*, 284 U.S. at 304) (other citations and internal quotations omitted). In this case, this analysis must be applied to the offenses of rape of a child and aggravated sexual battery, as defined in the Tennessee Code.

In Tennessee, the offense of rape of a child consists of two elements: (1) that the defendant sexually penetrate the victim; and (2) that the victim be between three and thirteen years of age. T.C.A. § 39-13-522(a) (2006). The offense of aggravated sexual battery consists of the following two elements, which differ slightly from the elements of rape of a child: (1) that the defendant had "unlawful sexual contact," which the Code defines as the intentional touching of intimate parts with the purpose of sexual arousal or gratification, with the victim; and (2) that the victim be less than thirteen years of age. T.C.A. §§ 39-13-501(6), -504(a)(1)-(4) (2006). In summary, a defendant must penetrate the victim in order to commit rape of a child, but not in order to commit aggravated sexual battery. Similarly, although a defendant must touch a victim's "intimate parts" with the purpose of deriving sexual arousal in order to commit aggravated sexual battery, rape of a child requires no similar purpose. Therefore, the offenses of rape of a child and aggravated sexual battery each require "proof of fact that the other does not" and, as a result, are not the "same" for double jeopardy purposes. *See State v. Larry Darnnell Pinex*, No. M2007-01211-CCA-R3-CD, 2008 WL 4853077, *9 (Tenn. Crim. App., at Nashville, Nov. 6, 2008) (concluding that, per *Blockburger,* aggravated rape and aggravated sexual battery are separate offenses), *perm. app. denied* (Tenn. May 11, 2009).

---

[2]*See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

The presence of different statutory elements weighs against a finding of multiplicity in cases of this type, but it does not preclude such a finding. *Denton*, 938 S.W.2d at 378; *compare State v. Barney*, 986 S.W.2d 545, 549-50 (Tenn. 1999) (holding separate convictions for rape of a child and aggravated sexual battery did not violate double jeopardy), *with State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3CD, 2004 WL 2726034, at *5-6 (Tenn. Crim. App., at Nashville, Nov. 30, 2004) (holding separate convictions for rape of a child and aggravated sexual battery did violate double jeopardy). In this case, the determination of whether the two convictions violate double jeopardy depends on the additional factors articulated in *Denton*.

## 2. Evidence Used for Each Conviction

The second *Denton* factor requires that we examine the evidence used to convict the Defendant in light of our Supreme Court's decision in *Duchac*, 505 S.W.2d at 239-40. *Denton*, 932 S.W.2d at 381. In *Duchac*, our Supreme Court set out what has been called the "same evidence test," which is a determination of "whether the same evidence is required to prove" both offenses at issue. *Duchac*, 505 S.W.2d at 239. If the same evidence is not required to prove each offense, then the fact that both charges resulted from one event does not implicate double jeopardy concerns. *Id*.

In this case, we conclude that the same evidence is not required to prove the Defendant's convictions for rape of a child and aggravated sexual battery. The victim's testimony that the Defendant digitally penetrated her vagina on her grandmother's bed after removing her pants and underwear supports his conviction for rape of a child. The victim's testimony that, during the same episode of abuse in which he digitally penetrated her vagina, the Defendant rubbed the area surrounding her anus supports the Defendant's conviction for aggravated sexual battery. As such, the portions of the victim's testimony that support the Defendant's rape of a child conviction are distinct from those that support his conviction for aggravated sexual battery. Thus, the evidence used to convict the Defendant was not "the same" within the meaning of *Duchac*. 938 S.W.2d at 381.

## 3. Discrete Versus Continuous Nature of Conduct

The third *Denton* factor requires us to consider whether the Defendant's conduct affected multiple victims and whether it constituted discrete acts. *Denton*, 938 S.W.2d at 381. The conduct at issue clearly involves only one victim. Whether the convictions are based on discrete or continuous conduct, however, depends on a five-part consideration described in *State v. Barney*, 986 S.W.2d 545, 548-49 (Tenn. 1999). In *Barney*, our Supreme Court set out five factors to be considered in determining whether convictions based on the same occasion involve discrete or continuous conduct. *Id*. The *Barney* considerations guide a court in determining whether an instance of conduct in the course of a sexual assault is "directly facilitative, and thus, incidental, or merely preparatory in the sense of intending to arouse the victim or perpetrator" for the commission of the principle offense. *Id*. Maintaining the defendant's intent as the "critical consideration," a court should consider the following aspects of the defendant's conduct:

14

1. temporal proximity–the greater the interval between the acts, the more likely the acts are separate;

2. spatial proximity–movement or re-positioning tends to suggest separate acts;

3. occurrence of an intervening event–an interruption tends to suggest separate acts;

4. sequence of the acts–serial penetration of different orifices as distinguished from repeated penetration of the same orifice tends to suggest separate offenses; and

5. the defendant's intent as evidenced in his conduct and statements.

*Id*. "The fact that the acts were closely related in time and place does not render them inseparable; indeed, emphasizing only time and place is tantamount to a 'same transaction' analysis, which is not part of the *Denton* analysis." *Cable v. Clemmons*, 36 S.W.3d 39, 43 (Tenn. 2001).

In the case under submission, K.D. described an episode of sexual abuse in which the Defendant sexually contacted several areas of her body on her grandmother's bed. She testified the Defendant removed her pants and underwear, lay her down on her grandmother's bed, and began to "lick" her "private." While he did so, he began to move his fingers in and out of her vagina. K.D. said the Defendant also rubbed her buttocks and the area around her anus. After the Defendant finished, he told K.D. to keep what happened a "secret."

Analyzing the Defendant's two acts under the *Barney* factors, we conclude the acts to be discrete, separate acts. The evidence does not suggest a pause between the Defendant's vaginal penetration of the victim and his touching her anus. Nor does a re-positioning or an interruption separate the actions. The transfer of the Defendant's acts from one area of K.D.'s body to another suggests the acts were distinct. The Defendant moved from one orifice to another, rather than repeatedly penetrating or contacting the same orifice. In our view, the transfer between one area of a victim's body to another sets in motion a new, distinct set of physical and emotional responses in the victim. The effect of the contact with a distinct part of the victim's body occurs whether or not a defendant pauses, repositions, or behaves differently between making contact with the second orifice. In this case, therefore, the Defendant's transfer of his attention and actions from the victim's vagina to her anus gave rise to his culpability for a separate offense. Accordingly, the third factor does not weigh in favor of the Defendant's argument.

### 4. Legislative Intent Behind Offense Statutes

The fourth *Denton* factor requires us to compare the relevant statutes and their respective purposes. *Denton*, 938 S.W.2d at 381. As stated by our Supreme Court, the rape and sexual battery statutes are both "intended and designed to deter and punish sexually assaultive conduct." *Mixon*, 983 S.W.2d at 676. Accordingly, the fourth factor weighs in favor of the Defendant's argument.

In summary, aggravated sexual battery and rape of a child are separate offenses under

*Blockburger* analysis, the same evidence is not necessary to establish the Defendant's guilt of both convictions, the Defendant's actions were conceptually separate and distinct under *Barney*, and the Legislature had a common purpose in criminalizing rape of a child and aggravated sexual battery. Three of the four *Denton* factors, therefore, weigh in favor of punishing the Defendant's actions separately. *Denton*, 938 S.W.2d at 378. Based on our careful review of the above factors, therefore, we conclude the Defendant's convictions for rape of a child and aggravated sexual battery do not violate the Tennessee Constitution's proscription against double jeopardy. The Defendant has, therefore, failed to demonstrate that a "clear and unequivocal rule of law" has been breached, which is necessary to demonstrate plain error. *Adkisson*, 899 S.W.2d at 641-42; *Smith*, 24 S.W.3d at 282-83. As such, he is not entitled to relief on this issue.

## C. Sentencing

### 1. Length of Sentence

The Defendant objects to the trial court's application of enhancement factor (14), that he abused a position of private trust to facilitate the commission of the offense, to enhance each of his sentences. T.C.A. § 40-35-114(14) (2006). He argues his romantic relationship with the victim's grandmother did not create a "position of trust" between himself and the victim within the meaning of enhancement factor (14). Noting that the victim referred to the Defendant as her "Pepa" and that the sexual contact occurred when the Defendant was caring for the victim while her grandmother was at work, the State responds that the Defendant was in a position of private trust with the victim, which he used to facilitate his sexual contact with the victim.

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court properly sentenced the defendant. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. If the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, T.C.A. § 40-35-103 (2006), we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of

16

sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2009); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

In Tennessee, if the defendant committed his crime before July 1, 2005, he may either be sentenced under the 1989 Criminal Sentencing Act and in accordance with *Blakely v. Washington* and *State v. Gomez*, or he may sign a waiver that allows the trial court to sentence him under the 2005 Sentencing Reform Act. *Blakely*, 542 U.S. 296 (2004); *Gomez*, 239 S.W.2d 722 (Tenn. 2007). The Defendant committed his crimes in May and April of 2005 and was sentenced on January 18, 2008. The Defendant, however, signed a waiver for the trial court to sentence him under the 2005 Sentencing Reform Act.[3]

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). The Tennessee Code allows a sentencing court to consider the following enhancement factors, among others, when determining whether to enhance a defendant's sentence:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

. . .

(14) The defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense . . . .

T.C.A. § 40-35-114(1), (14) (2006). If an enhancement factor is not already an essential element of the offense and is appropriate for the offense, then a court may consider the enhancement factor in its length of sentence determination. T.C.A. § 40-35-114 (2006). In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e).

---

[3] The legislature amended the Sentencing Reform Act of 1989, with the changes taking effect on June 7, 2005. When, as in this case, the crime occurred before June 7, 2005, the Defendant may "choose" the sentencing scheme for the trial court to use when sentencing him. *See State v. Joe Allen Brown*, No. W2007-00693-CCA-R3-CD, 2007 WL 4462990, at *4 n 1 (Tenn. Crim. App., at Jackson, Dec. 20, 2007), no Tenn. R. App. P. 11 application filed.

17

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2006); *Carter*, 254 S.W.3d at 343.

The Defendant is a Range I offender, and rape of a child is a Class A felony. T.C.A. § 39-13-522. Therefore, the appropriate range for the Defendant's rape of a child conviction is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1) (2006). Attempted rape of a child and aggravated sexual battery are Class B felonies. T.C.A. §§ 39-13-522, -504. Therefore, the appropriate range for both the Defendant's attempted rape of a child conviction and his two aggravated sexual battery convictions is eight to twelve years.

At the conclusion of the Defendant's sentencing hearing, the trial court applied two enhancement factors to each of his four convictions: enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and enhancement factor (14), that the defendant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense. *See* T.C.A. § 40-35-114(1), (14). The court explained its finding, under factor (14), that the Defendant "abused a position of trust, public or private trust, in a manner that significantly facilitated the commission or the fulfillment of the offense":

> She was in the custody of her grandmother who works. And so [the Defendant] was in charge of the supervision of the child. . . . [S]he was put in . . . his care and these offenses occurred when he had that. So I think the record clearly makes out factor fourteen. So I'm going to use factor one and fourteen as to all counts.

The trial court recognized the Defendant's poor health as a mitigating factor under Tennessee Code Annotated section 40-35-113(13), which allows a trial court to consider "[a]ny other factor consistent with the purposes of this chapter" as a mitigating factor. The trial court gave the Defendant an enhanced sentence of twenty-two years for his rape of a child conviction, and enhanced sentences of ten years each for his remaining three convictions.

The Defendant disputes only the trial court's application of enhancement factor (14), that he abused a position of private trust to facilitate his sexual contact with the victim. *See* T.C.A. § 40-35-114(14). In support of his argument that he was not in a position of private trust with the victim, he cites our Supreme Court's opinions holding that neither a significant age difference nor living in the same household alone creates a position of trust between defendant and victim. *See State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996) (age difference insufficient alone to create position of trust); *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (living in same household insufficient alone to create position of trust).

After a thorough review of the record, we conclude the record contains indicia of a dependent relationship between the Defendant and K.D., in addition to their living together and their age difference. First, K.D. referred to the Defendant as her "Pepa," which in our view indicates she regarded the Defendant, who was dating her grandmother, as an authority figure. Further, the victim was placed in the Defendant's charge while her grandmother worked. Therefore, K.D. was placed in a position in which she was expected to listen to and obey the Defendant. These factors, coupled with an age difference and the fact K.D. lived with the Defendant and her grandmother in an arrangement that approximated a nuclear family model, indicate the Defendant was in a position of trust with K.D. *See Kissinger*, 922 S.W.2d at 488; *Gutierrez*, 5 S.W.3d at 646. The record does not preponderate against the trial court's finding that the Defendant was in a "position of private trust" with the victim, which he used to facilitate his sexual contact with the victim. *See* T.C.A. § 40-35-114(14). We conclude that the trial court did not err when it applied enhancement factor (14) to the Defendant's sentences. As such, the Defendant is not entitled to relief on this issue.

## 2. Alignment of Sentences

The Defendant also contends the trial court erred when it ordered the Defendant to serve his rape of a child conviction consecutively to his convictions for attempted rape of a child and aggravated sexual battery. He argues that, in order to base consecutive sentencing on Tennessee Code Annotated section section 40-35-115(5)(b), as the trial court in this case did, a trial court must make several factual findings the trial court in this case failed to make. The State responds that, although the trial court's findings may be incomplete, the record supports the existence of the factors necessary to base consecutive sentencing on subsection (5)(b).

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of seven listed factors exists. These seven factors include factor (5), which applies where:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

T.C.A. § 40-35-115(b)(5). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Rule 32(c) of the Tennessee Rules of Criminal Procedure instructs a trial court to explicitly recite on the judgment its reasons for imposing a consecutive sentence.

On appeal, the Defendant asserts the trial court improperly imposed consecutive sentencing

19

based upon factor (5). Relying on *Raygan L. Presley v. State*, the Defendant asserts that, in order to base consecutive sentencing on factor (5), each consideration mentioned in factor (5) must weigh in favor of consecutive sentencing. No. M2007-02487-CCA-R3-CD, 2008 WL 3843849, *8-9 (Tenn. Crim. App., at Nashville, Aug. 18, 2008), *no Tenn. R. App. P. 11 application filed*. Our examination of case law reveals, however, that each factor (5) consideration need not weigh in favor of consecutive sentencing in order for the factor to apply.

In *Presley*, this Court reversed consecutive sentencing based on factor (5) where the victim's relationship with the defendant (her stepfather) was the sole consideration that favored consecutive sentencing, and the record preponderated against the trial court's finding of residual mental or physical damage in the victim and failed to establish the that the three remaining considerations weighed in favor of consecutive sentencing. *Id*. The Court explained consecutive sentencing was improper because the record established only that one consideration, the victim's relationship with the defendant, favored consecutive sentencing. *Id*. *Presley*, therefore, does not require that each factor (5) consideration weigh in favor of consecutive sentencing, as the Defendant insists. Instead, it merely cautions that one factor's weighing in favor of consecutive sentencing does not alone establish factor (5) as a statutory basis for consecutive sentencing.

At the conclusion of the sentencing hearing, the trial court found that factor (5) justified consecutive sentencing:

> The grounds for which I can run things concurrently or consecutively are laid out in 40-35-115. The only one that would apply in this case would be factor number five, that if convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the victim and the [D]efendant. And, clearly, . . . he was the boy[friend] of her grandmother, who . . . later married [the Defendant]. The time of the undetected sexual activity, which in this particular case was relatively short, considering some of the cases that I've heard[] [and] [t]he nature and scope of the sexual acts and the extent of the residual physical or mental damage to the victim or the victims . . . would have to be made out by the testimony that was at trial, which there wasn't all that much. But I think when you look at [the facts] . . . as a whole, there [are] some real serious problems with the way and the manner in which this occurred. The victim, who had obvious issues–she hasn't seen her mother in some time. I think she just sort of disappeared. [The victim] [w]as in the custody of her grandmother, whose boy[friend] then abuses her while she is in his care. I think [factor (5)] has been made out.

The trial court therefore, found that all but one of the factor (5) considerations weighed in favor of consecutive sentencing. The trial court then ordered the Defendant to serve his twenty-two year sentence for rape of a child consecutively to his three remaining sentences of ten years each, which were to be served concurrently. The Defendant's total effective sentence, therefore, was thirty-two years.

We conclude the trial court properly imposed consecutive sentencing based on factor (5). The Defendant stands convicted of two statutory offenses involving sexual abuse of a minor, rape of a child and attempted rape of a child. Therefore, as the trial court noted, the Defendant clearly meets the first prerequisite for factor (5)'s application. *See* T.C.A. 40-35-115(5). Both K.D. and Dile testified Dile was in a romantic relationship with the Defendant, and the Defendant was charged with caring for K.D. in Dile's absence when the abuse occurred. The record, therefore, does not preponderate against the court's finding that the relationship between K.D. and the Defendant favored consecutive sentencing. Because K.D. testified the Defendant sexually assaulted her on at least four different occasions, penetrating her on at least one of these occasions, the record does not preponderate against the trial court's finding that the nature and scope of the sexual acts justified consecutive sentencing. Finally, according to the presentence report, at the time of sentencing the victim was receiving counseling from an agency that provides psychological care to sex abuse victims. Therefore, the record does not preponderate against the trial court's finding that K.D.'s residual mental damage justified consecutive sentencing. In summary, the Defendant was convicted of two statutory sexual offenses involving a child and the trial court found all but one of the additional factor (5) considerations weighed in favor of consecutive sentencing. We conclude, therefore, that the trial court properly imposed consecutive sentencing based on factor (5). *See* *Presley*, 2008 WL 3843849, at *8-9. Accordingly, we affirm the trial court's application of consecutive sentencing. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude the evidence is sufficient to support the Defendant's convictions, that his convictions for rape of a child and aggravated sexual battery do not violate his right against double jeopardy, and that the trial court properly sentenced him. Accordingly, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

21